UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

CAITLYN KOFFARNUS,                                                           PLAINTIFF

v.                                                      CIVIL ACTION NO. 3:15-CV-00473-CRS

UNITED STATES OF AMERICA,                                                   DEFENDANT

Memorandum Opinion

I.   Introduction

On September 6, 2011, a gunman opened fire at an IHOP in Carson City, Nevada. Sergeant Caitlin Koffarnus of the Army National Guard suffered a gunshot wound to her foot.

The Army denied Koffarnus's claim for benefits under the Traumatic Servicemembers' Group Life Insurance Program. *See* 38 U.S.C. § 1980A. After several administrative appeals and a final denial, Koffarnus sued the United States.

The United States moves to dismiss for lack of subject matter jurisdiction. In the alternative, the United States moves for summary judgment. For the reasons below, the Court will deny the motion and grant summary judgment to Koffarnus *sua sponte*.

II.   Subject matter jurisdiction

"Subject matter jurisdiction is always a threshold determination." *American Telecom Co., L.L.C. v. Republic of Lebanon*, 501 F.3d 534, 537 (6th Cir. 2007). "As always, the party invoking federal jurisdiction has the burden to prove that jurisdiction." *Glob. Tech., Inc. v. Yubei (Xinxiang) Power Steering Sys. Co., Ltd.*, 807 F.3d 806, 810 (6th Cir. Dec. 7, 2015).

The Traumatic Servicemembers' Group Life Insurance program (the "Program" or "TSGLI") is an automatic rider to the Servicemembers' Group Life Insurance program, codified

1

at 38 U.S.C. §§ 1970 – 1980A.  The Program provides a benefit when a servicemember suffers a traumatic injury.  38 U.S.C. § 1980A.

The statute says, "The district courts of the United States shall have original jurisdiction of any civil action or claim against the United States" brought under the Servicemember's Group Life Insurance program.  38 U.S.C. § 1975; *see also*, *Foster v. United States*, 111 Fed.Cl. 658, 663 (Fed. Cl. 2013) (finding that the Federal Court of Claims lacked subject matter jurisdiction over a traumatic injury benefits claim because "38 U.S.C. § 1975 provides a ready avenue for Major Foster to find relief in district court.").

The United States argues that this Court "lacks subject matter jurisdiction over two of Plaintiff's claims."  Def.'s Mem. Supp. Mot. Dismiss 16, ECF No. 11-1.  However, the United States concedes, "it is undisputed that this Court has jurisdiction pursuant to 38 U.S.C. § 1975."  Def.'s Reply Supp. Mot. Dismiss 2, ECF No. 18; *see also*, Compl.  ¶ 4, ECF No. 1 ("This Court has jurisdiction over the parties under 38 U.S.C. [§] 1975, as well as under the terms of the TSGLI program, as any member who receives an adverse TSGLI decision may obtain judicial review in any United States District Court of competent jurisdiction.").

The United States' argument that the Court lacks subject matter jurisdiction because the complaint's prayer for relief seeks a judgment of money damages is without merit.  "A claim can be sufficient for subject-matter jurisdiction purposes even if it is unsuccessful and possibly verging on the foolhardy in light of prior precedent barring the relief sought."  *Hamdi ex rel. Hamdi v. Napolitano*, 620 F.3d 615, 628 (6th Cir. 2010) (internal quotation marks omitted).

The Court finds that it has subject matter jurisdiction under 38 U.S.C. § 1975 to hear Koffarnus's claim for an alleged wrongful denial of benefits under the Program.

 III.  <u>Summary judgment standard</u>

2

A party moving for summary judgment must show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 – 48 (1986).

IV.    Certified administrative record

On September 6, 2011, around 9:00 am, Sergeant Koffarnus[1] was dining at an IHOP restaurant in Carson City, Nevada with four other uniformed members of the Army National Guard. A gunman opened fire, killing three National Guardsmen and a woman. Certified Admin. Record ("CAR") 078, 160, ECF No. 11-2.

Koffarnus suffered a gunshot wound to her left foot.[2] She underwent emergency surgery which removed dead tissue, sharp bone fragments, bullet fragments, and placed a metal external fixation device to the left side of her left foot. *Id.* at 050 – 052.

The day after the shooting, the hospital discharged her. *Id.* at 011. The discharge notice said, "activity as tolerated, no driving, avoid tub bath, keep leg elevated, may use ice pack for 20-30 min every 2-3 hours as necessary," "keep incision area dry," and "non weight bearing on L foot until cleared." *Id.* at 056. Other discharge records indicate that Koffarnus needed assistive

---

[1] At the time of the shooting, Koffarnus's last name was Kelley.

[2] In spite of her injury, Koffarnus rendered aid to others who were injured. She received a Commendation Medal for her bravery following the shootout. CAR 237. In September 2013, she was promoted to Staff Sergeant. *Id.* at 198. In October 2013, she received an honorable discharge. *Id.* at 193.

equipment for ambulation[3] and an assistive person for transferring,[4] toileting, bathing, and dressing. *Id.* at 054.

In late September 2011, Koffarnus applied for benefits under the Program. Under Part A of the application, a servicemember discusses the traumatic injury. *See, e.g.*, *id.* at 007. Under Part A, Koffarnus wrote:

> I was shot in the foot. A gunman came into the IHOP and shot a group of five soldiers. I watched my commander and supply sergeant die then rendered aide to my PSNCO, training NCO, and a civilian caught in cross-fire. I was shot in the foot and consequently will need a few surgeries to repair what little bones I have left.

*Id.*

Under Part B of the application, a medical professional describes the patient's "inability to independently perform activities of daily living." *See, e.g.*, *id.* at 014. "Activities of daily living" ("ADLs") include bathing, maintaining continence, dressing, eating, toileting, and transferring. 38 C.F.R. § 9.20(e)(6(vi). Dr. Greg Lundeen, Koffarnus's treating orthopaedic surgeon, certified Part B. Dr. Lundeen certified that Koffanus "cannot stand on injured foot," and was "unable to bathe independently," but he did not indicate that Koffarnus was unable to do any other ADLs. CAR 014 – 015.

Throughout the fall of 2011, Koffarnus saw Dr. Lundeen for follow-up visits and treatment. On October 11, Lundeen removed the external fixation device without anesthesia. *Id.* at 063. The record of her visit to Lundeen's office on October 27 is the first notation in her medical records that Koffarnus was "weightbearing to tolerance." *Id.* at 064.

---

[3] Ambulation means to move from place to place. Merriam-Webster Medical Dictionary, http://www.merriam-webster.com/medical/ambulate.

[4] The regulations describe "transferring" as "transferring in or out of a bed or chair with or without equipment." 38 C.F.R. § 9.20 (6)(vi)(F).

4

In December 2011, Koffarnus underwent reconstructive surgery. *Id.* at 067. Four weeks after reconstructive surgery, she was walking using a boot. *Id.* at 068. By February 14, 2012, Dr. Lundeen transitioned her to regular shoes, and she was to begin physical therapy. *Id.* at 069.

On December 19, 2011, the Program denied Koffarnus's claim for benefits. *Id.* at 020 – 022. Under the heading "Why Your Claim Was Not Approved," the letter says,

> Your claim for inability to independently perform Activities of Daily Living (ADLs) due to traumatic injury (other than traumatic brain injury) was not approved because there is not enough medical information to support that you could not perform ADLs independently.

*Id.* at 020.

In January 2012, Koffarnus filed for reconsideration. On April 11, 2012, the Program declined to overturn its previous decision. *Id.* at 029. The letter said,

> The application submitted only has the ADL loss of bathing claimed. According to TSGLI standards, a Servicemember must be incapable of performing two or more of the six ADLs for a period of 30 days or greater. Also, there was no supporting medical documentation submitted with your claim. We must have medical documentation, from the period for which you are claiming that supports your losses. Such documentation could include discharge summaries, nurse's notes, occupational or physical therapy reports, etc.

*Id.*

On October 15, 2012, with the assistance of legal counsel, Koffarnus appealed to the U.S. Army's Human Resources Command. Under Part B of this application, Dr. Lundeen certified that from September 6, 2011 to October 20, 2011, Koffarnus was unable to independently bathe, dress, and transfer. *Id.* at 044 – 045. Dr. Bruce Ford, a podiatrist, also certified Part B of the application. *Id.* at 147.[5] Koffarnus attached her hospital records, discharge instructions, and records from Dr. Lundeen's Reno Orthopaedic Clinic. *Id.* at 053 – 069.

---

[5] Dr. Ford's certification under Part B is ambiguous as to whether he observed Koffarnus's loss or whether he only reviewed her medical records. *See* CAR 147. However, the plaintiff concedes that Dr. Ford did not personally observe Koffarnus's loss. Pl.'s Resp. 8.

5

As part of this appeal, Dr. Benjamin Withers, a consulting physician for the Army's Traumatic Servicemember's Group Life Insurance office, reviewed Koffarnus's claim. *Id.* at 086. Dr. Withers wrote, "26 year old female soldier injured in a workplace shooting (gunman in IHOP) suffering GSW to L foot resulting in STI & Fx that was repaired surgically that same day with ORIF & EXFIX. [s]he recovered w/o complication and was discharged to out-patient status." *Id.* Withers recommended disapproving Koffarnus's claim, concluding, "Otherwise healthy Pts [patients] are not rendered ADL-incapable by single limb trauma/dysfunction/immobilization. Submitted documents do not indicate that the injury rendered the claimant incapable of performing any ADLs for 30+ days, per TSGLI guidelines." *Id.* On November 8, 2012, the appeals panel denied Koffarnus's claim. *Id.* at 085.

On September 5, 2013, the Army Board for the Correction of Military Records (the "Board") heard Koffarnus's final administrative appeal. In addition to the previous medical records submitted, Koffarnus also offered a letter from her spouse and five pictures of her injury and the external fixation device. *Id.* at 136, 155 – 59. Her spouse wrote,

> Assistance bathing: She could not physically get in and out of the bath tub, and with her cast, she could not stand in the shower to bathe. I had to lower her into and pull her out from the bath each morning. This lasted for over three months.
>
> Assistance dressing: Caitlin could not stand with the injury to her foot, and she also had a lot of difficulty pulling clothes over the cast on her leg. With the gunshot wound to her left ear, her equilibrium was altered and she could not balance to dress herself. This lasted over a month.
>
> Assistance in ambulation: As she was shot in the left foot, she was unable to walk. For the first three months I aided her in moving from a recliner to a wheelchair. We live in a two-story house and Caitlin was unable to maneuver up the stairs for four months I helped her get up and down the stairs. I also aided in moving from her wheelchair to the toilet and back again on a daily basis for the first three months.

*Id.* at 136.

On September 9, 2013, the Board denied Koffarnus's final appeal. *Id.* at 096. The Board's entire discussion and conclusions on Koffarnus's claim is as follows:

1. Evidence shows that the applicant was injured in a random shooting at a restaurant and she suffered a gunshot wound to her left foot that was surgically repaired the same day. She was hospitalized for only two days and her discharge note, dated 7 September 2011, indicates she was discharged non-weight bearing on left foot, activities as tolerated.
2. ADL loss must be certified by a healthcare provider in Part B of the claim form, and ADL loss must be substantiated by appropriate documentation such as Occupational/Physical Therapy Reports, Patient Discharge Summaries, or other pertinent documents demonstrating the injury type and duration of ADL loss. While TSGLI claims will not be approved without a certification from a healthcare provider, additional documentation must be provided to substantiate the certification.
3. The applicant claimed loss of three ADLs for 45 days. However, the submitted documentation does not indicate that the injury rendered the applicant incapable of performing any ADLs for 30 days or more, per TSGLI guidelines.
4. Otherwise healthy patients are not rendered ADL incapable by a single limb trauma/dysfunction/immobilization.
5. Regrettably, based on the foregoing, there is an insufficient evidentiary basis for granting the requested relief.

*Id.*

## V. Review of Board's determination

### A. Scope of review

The Administrative Procedures Act ("APA") says, "A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. Under the APA, this Court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed; and
(2) hold unlawful and set aside agency action, findings, and conclusions found to be—
(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law ...

7

5 U.S.C. § 706. "Board decisions are subject to judicial review and can be set aside if they are arbitrary, capricious, or not based in substantial evidence." *Chappell v. Wallace*, 462 U.S. 296, 303 (1983). The court of appeals has declined to hold that reviewing courts owe even greater deference to the Board than civilian agencies. *Ivey v. McHugh*, 614 F.App'x 257, 261 (6th Cir. Jun. 5, 2015).

Regarding the APA's arbitrary and capricious standard, the Supreme Court has said,

> The scope of our review under the standard is 'narrow;' as we have often recognized, 'a court is not to substitute its judgment for that of the agency. Agencies ... have expertise and experience in administering their statutes that no court can properly ignore. But courts retain a role, and an important one, in ensuring that agencies have engaged in reasoned decisionmaking. When reviewing an agency action, we must assess, among other matters, whether the decision was based on a consideration of the relevant factors and whether there was a clear error of judgment. That task involves examining the reasons for agency decisions—or, as the case may be, the absence of such reasons.

*Judulang v. Holder*, 132 S.Ct. 476, 483 (2011) (internal quotation marks and citations omitted). Further, an agency decision is arbitrary and capricious when the agency

> has relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 658 (2007).

B. <u>Applicable statutes and regulations</u>

The Program provides for the payment of insurance benefits to a servicemember who "sustains a traumatic injury ... that results in a qualifying loss." 38 U.S.C. § 1980A(a)(1). The statute defines a "qualifying loss" as, *inter alia*, "the inability to carry out the activities of daily living resulting from traumatic injury." 38 U.S.C. § 1980A(b)(1). The "inability to carry out the activities of daily living" is "the inability to independently perform two or more of the following six functions: (i) Bathing. (ii) Continence. (iii) Dressing. (iv) Eating. (v) Toileting. (vi)

8

Transferring." 38 U.S.C. § 1980A (b)(2)(D); 38 C.F.R. § 9.20(e)(6)(vi). To qualify for a $25,000 benefit, the traumatic injury must result in an individual's inability to perform at least two activities of daily living for thirty consecutive days. 38 C.F.R. § 9.20(f).[6]

The United States concedes that Koffarnus suffered a traumatic injury caused by a traumatic event when she suffered a gunshot wound to her foot. Def.'s Mem. 20. The United States argues, "The Board's decision to deny Plaintiff's TSGLI claim was reasonable, because the medical evidence—evidence provided by the Plaintiff—failed to establish that she could not independently perform at least 2 of 6 ADLs for 30 or more consecutive days as required under the TSGLI program." *Id.* at 22.

C. Whether the Board should have applied the "benefit of the doubt" rule

The Plaintiff argues that the Board should have applied the "benefit of the doubt" rule[7] to her claim for traumatic injury benefits. *See* Pl.'s Resp. 34 – 35, ECF No. 14. She did not raise this argument before the Board. *See* CAR 103 (citing preponderance of the evidence as the appropriate standard of review for the Board).

"The administrative waiver doctrine, commonly referred to as issue exhaustion, provides that it is inappropriate for courts reviewing agency decisions to consider arguments not raised

---

[6] The Program publishes a procedural guide, which the parties agree is not legally binding. Pl.'s Resp. 29; Def.'s Reply 9. The procedural guide says a patient is unable to bathe independently when "he/she requires physical, stand-by, or verbal assistance from another person ... to bathe more than one part of the body (via tub bath or sponge bath) or get in or out of the tub or shower." Proc. Guide A-18, ECF No. 11-4. A patient is unable to dress independently if "he/she requires physical, stand-by, or verbal assistance from another person ... to get and put on clothing, socks or shoes (may have help tying shoes)." *Id.* A patient is unable to transfer independently if "he/she requires physical, stand-by, or verbal assistance from other person ... to move into or out of a bed or chair." *Id.* "Without this physical, stand-by, or verbal assistance, the patient would be incapable of performing the task." *Id.*

[7] Under the benefit of the doubt rule, "When there is an approximate balance of positive and negative evidence regarding any issue material to the determination of a matter, the Secretary shall give the benefit of the doubt to the claimant." 38 U.S.C. § 5107.

before the administrative agency involved." *Coalition for Gov't Procurement v. Fed. Prison Indus.*, Inc., 365 F.3d 435, 461 – 62 (6th Cir. 2004).

Thus, the Court will not consider the Plaintiff's argument that the Board should have applied the benefit of the doubt rule because she did not raise it before the Board.

D. <u>Whether the Board acted arbitrarily and capriciously in denying Plaintiff's claim for traumatic injury benefits</u>

The Plaintiff argues that the Board acted arbitrarily and capriciously in denying her claim for traumatic injury benefits. The Court agrees with the Plaintiff.

1. <u>The physician certifications, discharge records, medical records, and spouse's letter contradict the Board's conclusion.</u>

The documents Koffarnus submitted contradict the Board's conclusion that "the submitted documentation does not indicate that the injury rendered the applicant incapable of performing *any* ADLs for 30 days or more, per TSGLI guidelines." CAR 096 (emphasis added). The documents Koffarnus submitted show that Koffarnus was incapable of performing three ADLS: dressing, transferring, and bathing, for thirty days or more.

Koffarnus submitted certifications from Dr. Lundeen and Dr. Ford who both said that Koffarnus was unable to independently perform three ADLs: bathing, transferring, and dressing, for at least thirty days after she was shot. *Id.* at 044, 147. Dr. Lundeen certified that Koffarnus was unable to independently bathe from September 6 to October 20 because she "cannot stand or get in/out of bathtub." *Id.* at 044. Dr. Lundeen certified that Koffarnus was unable to dress independently from September 6 to October 20 because she "cannot stand, cannot get pants over cast." *Id.* Further, Dr. Lundeen certified that Koffarnus was unable to transfer independently from September 6 to October 20 because she "cannot weight bear, stand or walk independently." *Id.* at 045.

10

Koffarnus supplemented these two certifications with her hospital discharge instructions and the medical records from her treatment at Dr. Lundeen's office. Koffarnus's discharge records said that she needed an assistive person for transferring, toileting, bathing, and dressing. *Id.* at 054. That same page indicates that a discharge nurse instructed Koffarnus and a caregiver about a "plan home with family assist." *Id.* The physical therapy initial evaluation said her level of independence in transferring from sitting to standing was "supervised." *Id.* at 055. The last page of her discharge records say, "activity as tolerated, no driving, avoid tub bath, keep leg elevated, may use ice pack for 20-30 min every 2-3 hours as necessary," remain "non weight bearing on L foot until cleared," and "keep incision area dry." *Id.* at 056. The medical records from Dr. Lundeen's office demonstrate that the external fixation device was attached to the side of her foot for over thirty days: September 6 to October 11, and she was unable to bear weight on that foot for over thirty days: September 7 to October 27.

Common sense dictates that a person who (1) has suffered a gunshot wound shattering the bones in her foot; (2) underwent emergency surgery to that foot; (3) has been ordered on discharge that she needs an assistive person for transferring, toileting, bathing, and dressing; (4) had a metal external fixation device holding the remaining bones in place; (5) has been ordered to remain non-weightbearing on that foot until cleared; and (6) has been ordered to keep her incision area dry and to avoid tub bath, would need the assistance of another person to dress, transfer, and bathe for at least thirty days after being shot.

Together, the two doctors' certifications, discharge instructions, and records from Dr. Lundeen's office support three conclusions. With regard to Koffarnus's ability to bathe herself, the only reasonable conclusion is that Koffarnus was unable to independently bathe until she was able to bear weight on her foot and shower by herself, or until she was able to climb in and out of

11

a bath tub. With regard to Koffarnus's ability to dress herself, the only reasonable conclusion is that Koffarnus was unable to independently dress until Dr. Lundeen removed the external fixation device and she could put on a pair of pants by herself without getting anything caught on the metal.[8] With regard to Koffarnus's ability to transfer, the only reasonable conclusion is that Koffarnus would not have been able to climb in and out of a chair or bed without the assistance of another person.

Koffarnus's spouse's letter corroborates these conclusions. The Board made no mention of this letter even though it provided further support for her claim that she was unable to independently bathe, transfer, and dress for at least thirty days after she was shot. As happened here, a doctor may order a patient to be nonweightbearing upon discharge and may document that medical advice in the patient's discharge instructions, but orthopedic records from the patient's outpatient follow-up visits would be unlikely to repeat the same instruction that the patient cannot independently dress, transfer, bathe, or toilet. Instead, as happened here, the orthopedic records would speak to whether bones were healing properly post-surgery, whether the patient needed more or less pain medication, whether the patient experienced any signs of infection, and whether the patient would undergo reconstructive surgery. *See id.* at 058 – 067. When the medical records do not explicitly address a patient's inability to independently perform the activities of daily living, letters from caregivers provide strong corroborating evidence of a patient's claim.

Koffarnus's spouse's letter fills in the gaps regarding her recovery at home that the orthopedic records would be unlikely to ever discuss: what her recovery was like during the

---

[8] At one point, Koffarnus did get something caught on the external fixation device. On October 4, she visited Dr. Lundeen because her external fixation device got caught on her dog collar. CAR 062. Dr. Lundeen had to tighten the external fixation device. *Id.*

month after she was shot. Her spouse described how Koffarnus was unable to independently bathe for over three months because she could not physically climb in and out of the bath tub, and she could not shower with her cast; how Koffarnus was unable to independently dress because she could not stand and had difficulty getting clothes over her cast for over a month; and Koffarnus was unable to independently transfer because she could not walk and needed aid moving from a recliner to her wheelchair. *Id.* at 136.[9] At the very least, the Board needed to respond to Koffarnus's spouse's letter, which corroborated her claim and was not frivolous. *See Conner v. U.S. Dep't of the Army*, 6 F.Supp.3d 717, 723 (W.D. Ky. 2014) (an agency decision may be arbitrary and capricious if the agency does not address a nonfrivolous argument made by plaintiff).

Koffarnus's physicians' certifications, discharge records, medical records from Dr. Lundeen's office, and her spouse's letter contradict the Board's conclusion that "the submitted documentation does not indicate that the injury rendered the applicant incapable for performing any ADLs for 30 days or more, per TSGLI guidelines." CAR 096. *See Nat'l Ass'n of Home Builders*, 551 U.S. at 658 (a reviewing court may find an agency decision arbitrary and capricious if the decision runs counter to the evidence before the agency). To the contrary, the documents Koffarnus submitted established that she was incapable of dressing, transferring, and bathing independently for over thirty days.

> 2. The Board copied a non-treating physician's generic conclusions without any application to Koffarnus's specific medical treatment or any discussion of the opinion of Koffarnus's treating physician.

---

[9] Her spouse also described how Koffarnus needed assistance moving from the wheelchair to the toilet and back again, but the Plaintiff has not argued that she was unable to independently toilet for thirty days after the shooting. CAR 136.

13

The Board's conclusion that the "submitted documentation does not indicate that the injury rendered the applicant incapable of performing any ADLs for 30 days or more, per TSGLI guidelines," is a generic denial without any application to Koffarnus's specific medical treatment, diagnosis, or prognosis. Additionally, the Board's conclusion that "Otherwise healthy patients are not rendered ADL-incapable by a single limb trauma/dysfunction/immobilization," is a generic statement without any legal basis[10] and wholly inapplicable to Koffarnus's recovery from her gunshot wound.

Rather than provide any explanation specific to Koffarnus, the Board copied Withers' conclusions and changed a few words. *Compare*, Withers Rep. CAR 086 ("Submitted documents do not indicate that the injury rendered the claimant incapable of performing any ADLs for 30+ days, per TSGLI guidelines.") *with* Board's decision CAR 096 ("However, the submitted documentation does not indicate that the injury rendered the applicant incapable of performing any ADLs for 30 days or more, per TSGLI guidelines."); *compare also*, Withers Rep. CAR 086 ("Otherwise healthy Pts are not rendered ADL-incapable by single limb trauma/dysfunction/immobilization.") *with* Board's decision CAR 096 ("Otherwise healthy patients are not rendered ADL incapable by a single limb trauma/dysfunction/immobilization.").

The Board copied Withers' generic conclusions without any mention of a relevant factor: the opinion of Koffarnus's doctors who reached the opposite conclusion. Although Dr. Ford did not treat Koffarnus, after reviewing her medical records, he certified that she was unable to independently dress, transfer, and bathe for at least thirty days after being shot. CAR 147.

In addition to Dr. Ford, Dr. Lundeen certified that Koffarnus was unable to independently dress, transfer, and bathe for at least thirty days after being shot. *Id.* at 125 – 126. Dr. Lundeen,

---

[10] There is no citation to the statute or regulations that would support this conclusion. The Court has been unable to find any legal basis for this statement.

14

Koffarnus's treating orthopedic surgeon, saw Koffarnus on a weekly or biweekly basis in the six weeks after she was shot. *See id.* at 057 – 065. Lundeen provided specific details supporting his conclusion that she was unable to independently dress, transfer, and bathe for at least thirty days after she was shot. *See, e.g.*, *id.* at 044 ("cannot get pants over cast"). Although the Board did not have to accept Lundeen or Ford's opinion at face value, as a treating physician, Lundeen's opinion "is entitled to substantially greater weight than the contrary opinion of a non-examining medical advisor." *Shelman v. Heckler*, 821 F.3d 316, 320 – 21 (6th Cir. 1987). In failing to mention Lundeen's opinion at all, the Board ignored evidence that was "entitled to substantially greater weight" than the generic conclusions provided by Withers, a non-treating physician.

It is not even clear that Withers read Koffarnus's medical records because he wrote, "she recovered w/o complication, and was discharged to out-patient status." CAR 086. He made no mention of her doctor's orders to remain nonweightbearing until cleared, avoid tub bath, to keep her incision area dry, and have an assistive person in bathing, toileting, dressing, and transferring. Withers made no mention of how having an external fixation device might affect Koffarnus's ability to transfer, dress, or bathe independently. Withers' report lacked any analysis or reasoning supporting his opinion that Koffarnus had not shown that she was incapable of performing any ADLs for thirty days.

Ultimately, the Board provided no explanation for why it adopted Dr. Withers' conclusions over the opinion of Koffarnus's two physicians, and especially her treating physician. *See Judulang*, 132 S.Ct. at 483 (a reviewing court may find an agency decision arbitrary and capricious if the agency did not consider relevant factors). Instead, the Board's conclusion that "the submitted documentation does not indicate that the injury rendered the applicant incapable of performing any ADLs for 30 days or more, per TSGLI guidelines,"

15

entirely failed to consider a vital aspect of Koffarnus's claim: the opinions of Koffarnus's medical professionals. *See Nat'l Ass'n of Home Builders*, 551 U.S. at 658 (a reviewing court may find an agency decision arbitrary and capricious if the agency entirely failed to consider an important aspect of the problem).

>             3. The Board's decision to deny Koffarnus's final appeal was arbitrary and capricious.

The Court has a duty to ensure that the Board engaged in reasoned decisionmaking. *Judulang*, 132 S.Ct. at 483. The Court is mindful that the standard of review is narrow, and it shall not substitute its own judgment for that of the agency. *Id.*

At the very least, reasoned decisionmaking involves forming a conclusion based on the evidence presented. Forming a conclusion that contradicts the physicians' certifications, discharge instructions, medical records, and a corroborating witness statement is not reasoned decisionmaking. Reasoned decisionmaking involves examining expert statements with a critical lens and independently evaluating the claim presented. Copying generic conclusions from a non-treating physician without mentioning the two contrary opinions of the patient's physicians is not reasoned decisionmaking.

Apparently, the Board thought Koffarnus was back on her feet, so to speak, immediately after her hospital discharge. The evidence presented to the Board told a different story, and it demonstrated that Koffarnus was unable to independently dress, transfer, and bathe for at least thirty days after suffering a gunshot wound to her foot.

The Court finds that the Board's decision to deny Koffarnus's final appeal was arbitrary and capricious because the decision ran counter to the evidence presented, *see* discussion *supra* Part V(D)(1), and the Board entirely failed to consider the important aspects of Koffarnus's claim, *see* discussion *supra* Part V(D)(2). Having found the Board's decision arbitrary and

16

capricious, the Court will vacate the Board's decision. The Court will deny the United States' motion for summary judgment.

    VI.    <u>Whether the Court should grant summary judgment to Koffarnus</u>

Koffarnus has not filed a cross motion for summary judgment, though she asks the Court to grant summary judgment in her favor *sua sponte*. See Pl.'s Resp. 39 n.10.[11] The United States acknowledged that it is on notice of the plaintiff's purported cross motion. See Def.'s Reply Supp. Mot. Summ. J. 1 n.1, ECF No. 18 ("Thus, Defendant's motion should be granted and Plaintiff's cross motion denied."). The undisputed record includes the plaintiff's complaint, certified administrative record, and the regulatory appendix. See Def.'s Mem. 1; Pl.'s Resp. 2.

Under Rule 56, the Court may grant summary judgment for a nonmovant after giving notice and reasonable time to respond. See Fed. R. Civ. P. 56(f)(1). The Court finds that the United States was on notice that the Court may grant summary judgment for Koffarnus. Likewise, the Court finds that the United States had a reasonable time to respond because it acknowledged Koffarnus's request for *sua sponte* relief in its reply brief, and the Court granted the United States leave to file additional pages in the reply. See Order 1, ECF No. 19.

The Court will grant summary judgment to Koffarnus *sua sponte*.

    VII.    <u>Conclusion</u>

The Court will deny summary judgment to the United States on Koffarnus's claim. The Court will grant summary judgment to Koffarnus *sua sponte*.

---

[11] Although Koffarnus did not file a cross-motion for summary judgment, she asks the Court to enter an order requiring the Traumatic Servicemember's Group Life Insurance office to pay the $25,000 benefit. Pl.'s Resp. 40; *contra*, Compl. 6, ECF No. 1 ("WHEREFORE, Plaintiff prays for the following relief: an award of appropriate TSGLI program benefits, which are formulaic in nature, in an amount to be determined by the Court;). In the alternative, Koffarnus asks the Court to remand with the "specific instruction that it certify Plaintiff as eligible for the requested $25,000 benefit." Pl.'s Resp. 40.

The Court will vacate the decision of the Board. The Court will remand to the Board for proceedings not inconsistent with this opinion. The Court will enter an order in accordance with this opinion.

March 29, 2016

**Charles R. Simpson III, Senior Judge**
**United States District Court**

18